Filed 2/10/25  Philadelphia Indemnity Ins. Co. v. 38700 10th St. East CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| PHILADELPHIA INDEMNITY INSURANCE COMPANY, | B318162, B319690 and B321363 |
| Plaintiff, Cross-defendant and Appellant, | Los Angeles County Super. Ct. No. 19STCV31707 |
| v. | |
| 38700 10TH STREET EAST, LLC, et al., | |
| Defendants, Cross-complainants and Appellants. | |

APPEALS from orders and a judgment of the Superior Court of Los Angeles County, Daniel S. Murphy, Judge. Affirmed in part, reversed in part.

Woolls Peer Dollinger & Scher and Lisa Darling-Alderton for Plaintiff, Cross-defendant and Appellant Philadelphia Indemnity Insurance Company.

Benedon & Serlin, Gerald M. Serlin and Melinda W. Ebelhar for Defendant, Cross-complainant and Appellant 38700 10th Street East, LLC.

Selman, Leichenger, Edson, Hsu, Newman & Moore and Bridget A. Moorhead for Defendant, Cross-complainant and Appellant CSE Safeguard Insurance Company.

———————————

38700 10th Street East, LLC (the LLC) owns a 28-unit apartment building in Palmdale known as the Royal Palms. Forty-three tenants sued the LLC, alleging substandard conditions at the Royal Palms caused "serious medical and health problems," as well as property damage and other physical and emotional injuries (the *Hardison* action). The *Hardison* complaint pleaded causes of action for breach of contract, breach of the implied warranty of habitability, negligence, nuisance, and violation of Civil Code section 1942.4.[1] The tenants claimed damages in excess of $5 million and prayed for statutory attorney fees under section 1942.4, in addition to other relief.

The LLC tendered its defense of the *Hardison* action to its insurance carriers, including Philadelphia Indemnity Insurance Company (PII) and CSE Safeguard Insurance Company (CSE). Each insurer agreed to provide a defense subject to a reservation of rights, including the right to seek reimbursement from the LLC for amounts paid in connection with uncovered claims. PII's policies excluded coverage for attorney fees taxed as costs against the LLC. CSE's policies did not have a similar exclusion.

---

[1] Statutory references are to the Civil Code, unless otherwise designated.

2

Following mediation, the parties settled the *Hardison* action for a lump-sum payment of $925,000 to be paid by the LLC's insurers to the *Hardison* tenants. The settlement agreement included a cost-waiver provision stating the parties would "bear their own costs and attorney fees incurred in this matter." The tenants' counsel later provided a declaration to PII stating his office would retain $407,000 of the settlement payment as fees and costs under his agreements with the tenants.

This appeal concerns the coverage action that followed the *Hardison* settlement. PII sued the LLC and CSE, seeking (1) reimbursement from each for the amount of PII's contribution to the *Hardison* settlement payment attributable to the tenants' claimed attorney fees; and (2) reimbursement from the LLC alone for PII's total settlement contribution. CSE filed a cross-complaint seeking reimbursement from the LLC for the insurer's entire contribution to the *Hardison* settlement. The trial court granted PII's motion for summary adjudication of its attorney fee reimbursement claims and, after a bench trial, found in favor of the LLC on the remaining issues. The court entered judgment for PII against the LLC for $304,796.66, representing the portion of the *Hardison* settlement the court found PII paid toward the tenants' attorney fees, and entered judgment for the LLC against PII and CSE on all other claims.

The LLC appeals the portion of the judgment entered in favor of PII on the insurer's attorney fee reimbursement claims. PII and CSE cross-appeal the remainder of the judgment entered in favor of the LLC. Because we conclude triable issues exist as to whether PII paid any of the *Hardison* tenants' attorney fees as part of the settlement, we reverse the portion of the judgment

3

entered in favor of PII.[2]  We affirm the judgment in all other respects.

**BACKGROUND**[3]

**1.**     *The* **Hardison** *Action*

In March 2017, the *Hardison* tenants filed their five-count complaint against the LLC.  Among other things, the tenants alleged they suffered bodily injuries and property damage due to "cockroach and bedbug infestations and lack of proper insect control"; "pollution from roach feces floating in the air and being inhaled"; and "bites from cockroaches, bedbugs and other insects, thereby causing serious medical and health problems."  The tenants claimed general, compensatory, and special damages

---

[2]     The LLC also appeals the denial of its motion to tax costs. Our reversal of the judgment and summary adjudication order renders this part of the appeal moot.

[3]     In addition to the facts stated in the introduction, we give a general overview of the facts and procedural history of the underlying proceedings, stating the evidence in the light most favorable to the LLC as the party opposing summary adjudication and the party prevailing on the remaining claims that were tried to the court.  (See *Borman v. Brown* (2021) 59 Cal.App.5th 1048, 1055 (*Borman*) ["A court considering a motion for summary adjudication must view the evidence and reasonable inferences from the evidence in the light most favorable to the opposing party."]; *Gajanan Inc. v. City and County of San Francisco* (2022) 77 Cal.App.5th 780, 791–792 [on review of a judgment after a bench trial, the appellate court considers the evidence in the light most favorable to the prevailing party, drawing all reasonable inferences in support of the trial court's factual findings].)  We elaborate on specific facts and proceedings later in this opinion where relevant to the parties' appellate arguments.

4

in excess of $5 million, and prayed for punitive damages, statutory attorneys' fees under section 1942.4, and injunctive relief.[4]

## 2. *The Insurance Policies*

The LLC tendered its defense of the *Hardison* action to its insurance carriers. All policies obligated the relevant carrier to pay, on behalf of the LLC, "those sums that the [LLC] becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' " that is "caused by an 'occurrence.' " The policies define an "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." The carriers assumed a similar obligation to pay sums the LLC "becomes legally obligated to pay as damages because of 'personal and advertising injury,' " including injuries arising out of the "wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies." For both

---

[4] Section 1942.4 prohibits a landlord from demanding or collecting rent if "all of the following conditions exist" before the landlord's demand: (1) the subject dwelling fails to meet habitability standards set forth in the Health and Safety Code; (2) a public officer "has notified the landlord or the landlord's agent in writing" of the landlord's obligation to abate the substandard conditions; (3) the "conditions have existed and have not been abated 35 days beyond the date of service of the notice" and "the delay is without good cause"; and (4) the conditions were not caused by the tenant. (§ 1942.4, subd. (a).) A landlord who violates section 1942.4 is liable to the tenant for "actual damages," and the "prevailing party" in litigation "shall be entitled to recovery of reasonable attorney's fees and costs of the suit in an amount fixed by the court." (*Id.*, subd. (b).)

forms of coverage, the insurers maintained "the right and duty to defend" the LLC "against any 'suit' " seeking these damages.

All policies, except those issued by CSE, contain the same supplementary payments provision for expenses incurred that do not constitute covered damages under the policy: "We will pay, with respect to any claim we investigate or settle, or any 'suit' against an insured we defend: . . . All court costs taxed against the insured in the 'suit'. However, these payments do not include attorneys' fees or attorneys' expenses taxed against the insured." The supplementary payments provision in CSE's policies does not include the exclusionary language for attorney fees and expenses taxed against the insured.

### 3.    *The* Hardison *Settlement*

The parties went to mediation, which produced a mediator's proposal to settle the *Hardison* action for $925,000 with each party to "pay its own fees and costs." Each insurer notified the LLC that its contribution toward the settlement would be subject to a reservation of rights to seek reimbursement, including with respect to any "portion of the settlement that corresponds to attorney's fees" claimed under section 1942.4. The carriers advised the LLC that it could elect to assume its own defense if it objected to the terms of the proposed contributions. The LLC did not elect to do so.

All parties accepted the mediator's proposal; however, coverage counsel for PII suggested the "formal written settlement agreement should include an allocation of some portion of the total settlement funds toward [the *Hardison* tenants'] attorney fees and costs." The LLC objected, observing the suggestion appeared to reflect "a concerted effort to modify the terms of the Mediator's proposal to benefit the carriers and their argument

6

[for] reimbursement of the attorney fees for [the *Hardison* tenants'] counsel." In a subsequent communication, the LLC's counsel recounted that the *Hardison* tenants' attorney had refused to "allocate sums" during the mediation, and that "such allocation" was not "agreed upon as [part of] the substantive terms of the settlement." He insisted the LLC would "not approve any settlement if the insurers have changed the terms of the Mediator's proposal via [the] allocating of settlement monies for either particular causes of action or attorney fees." He also reiterated that only "*a bulk unallocated settlement sum* will be agreed to."

The parties then began drafting the written settlement agreement. PII's counsel proposed revisions, including (1) inserting an "allocation of a portion of the settlement payment to attorneys' fees"; and (2) striking a paragraph providing the parties would bear "their own attorneys' fees and costs." The LLC objected to the revisions, reiterating, "the insurer's fee allocation demand was made at the time of the mediation and rejected by [the *Hardison* tenants]," and "the Mediator's Proposal did not include such an allocation, and the ultimate settlement accepted by both sides did not include such an allocation as a term." The company also emphasized that the parties' "bearing of their own attorneys' fees and costs was understood as a term of the Mediator's Proposal and the ultimate settlement, which was accepted by both sides."

The tenants and the LLC executed the *Hardison* settlement agreement.[5] The agreement provided for the LLC's insurers to

_____

[5] The *Hardison* tenants' counsel executed an addendum attesting that his clients had executed the settlement agreement after receiving his advice and approval as to its form.

7

make an unallocated lump-sum payment of $925,000 in consideration for dismissal of the *Hardison* action. It stipulated that execution would "constitute full and final settlement of the Litigation and all Released Matters, inclusive of all insurance, legal, medical, or other liens and/or encumbrances, all of which remain [the *Hardison* tenants'] sole legal and financial responsibility." And it provided that the parties would "bear their own costs and attorney fees incurred in this matter."

**4.** ***The Insurers' Reimbursement Action***

PII filed a complaint against the LLC and CSE, seeking (1) reimbursement from both for the amounts PII contributed to the alleged attorney fee portion of the *Hardison* settlement; and (2) reimbursement from the LLC alone of the total amount PII contributed to the settlement. CSE filed a cross-complaint seeking reimbursement from the LLC for the insurer's entire contribution to the *Hardison* settlement.[6]

**5.** ***The Trial Court Grants PII's Motion for Summary Adjudication of the Attorney Fee Claims***

PII moved for summary adjudication of its declaratory relief and reimbursement claims related to the alleged attorney fees paid as part of the *Hardison* settlement. Its supporting evidence included a premediation report prepared by the LLC's retained defense counsel, a declaration by the insurer's coverage counsel, and a declaration by the tenants' attorney in the *Hardison* action.

---

[6] After the *Hardison* settlement, the LLC's other insurers assigned their rights to PII. These insurers did not separately participate in the reimbursement action.

8

Defense counsel's premediation report opined that "landlord-tenant cases tend to be low in actual damages, and are typically driven by statutory damages and attorneys' fees" under section 1942.4. He added that "the standards of habitability are so high, and so numerous that nearly any rental unit can be found uninhabitable in some minor way—meaning that plaintiffs will almost always recover their attorney's fees in such actions."

Coverage counsel explained the LLC had "objected to including any allocation [of attorney fees] in the settlement agreement with the *Hardison* plaintiffs, and refused to sign any agreement which included an allocation." She "therefore requested that counsel for the *Hardison* plaintiffs, Robb Strom, provide a declaration setting out the amounts that would be paid to each plaintiff and to his office." Strom agreed to provide the declaration, which coverage counsel drafted, leaving "blanks as to the amounts paid to each plaintiff or to [the attorney's] firm" (the Strom declaration).

Strom declared that, once he received the settlement payment, he intended to distribute it to the tenants "pursuant to my agreements with the plaintiffs." He said $518,000 of the $925,000 settlement payment would be distributed to the tenants, while his office would retain $407,000 as fees and costs.

PII argued the alleged attorney fees included in the *Hardison* settlement were not covered as "damages" under the relevant insurance policies, and the fees also were excluded from coverage for taxed costs under the supplementary payments provision. The insurer asserted potential liability for attorney fees was a significant consideration driving the settlement, and it maintained the Strom declaration undisputedly established the amount paid for noncovered attorney fees.

9

The LLC opposed summary adjudication. It emphasized the settlement agreement specifically assigned to each party the obligation to pay its own costs and fees, and the settlement was in an unallocated lump sum—as the mediator had proposed. Thus, even if the policies did not cover the *Hardison* tenants' attorney fees, the LLC argued PII had failed to prove those fees were part of the settlement payment.

The trial court granted PII's motion. The court agreed with the insurer's construction of the policies, concluding there was no coverage for attorney fees paid in the *Hardison* settlement. It rejected the LLC's contentions regarding the lump-sum payment and the mediator's proposal, reasoning that, although the agreement did not expressly allocate funds to attorney fees, the settlement "by its terms was a settlement of that claim." And, the court found the Strom declaration served as "undisputed" evidence of a "fair and reasonable" allocation of the settlement amounts paid as attorney fees.

After further proceedings, the trial court entered an order granting PII summary adjudication. The court found the insurer was entitled to reimbursement from the LLC "in the amount of $304,796.66 representing the portion of the [*Hardison*] settlement" that PII and its assignees paid "toward the *Hardison* plaintiffs' attorney fees."

6.    *The Bench Trial*

The court held a bench trial on PII's remaining causes of action and CSE's cross-complaint for reimbursement of the entire settlement payment. The insurers sought to prove the *Hardison* tenants' alleged damages did not fall under the coverage provision for " 'bodily injury' or 'property damage' " because the injuries were not "caused by an 'occurrence' "—

10

defined as an " 'accident' " under the policies.  Similarly, they sought to prove there was no indemnity coverage under the policies' " 'personal and advertising injury' " provision because the *Hardison* tenants' claims were subject to an exclusion for injuries " 'caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury." ' "  With respect to both coverage provisions, the insurers maintained the LLC "had knowledge of a serious cockroach infestation at the property for many years," yet "never changed [its] pest control company or took any action to actually try to mitigate the problem."  Thus, they argued the LLC must have known its conduct would result in the *Hardison* tenants' alleged injuries, and those injuries therefore could not have been accidental.

The trial evidence showed the LLC contracted the property management company Anza to handle the day-to-day management of the Royal Palms.  Anza used a "tenant complaint" system to resolve problems at the units, as its onsite managers were not permitted to enter a tenant's apartment "at will."  The LLC also contracted with the pest control company Enviroworx to spray three to five of the complex's 28 units each month.  If a unit requested pest control services that were not scheduled for that month, Anza completed a work order to have the unit sprayed.  However, Anza's onsite manager testified that "most units with cockroaches were unsanitary, and some units would not cooperate in having their unit treated."

To prove their right to reimbursement, the insurers relied principally upon a series of 48 notices issued by the County of Los Angeles Department of Public Health (DPH) from September 2014 to August 2017 regarding cockroach infestation and other

11

violations at the Royal Palms.  The reports reflect that a number of these violations were cleared by March 2017, and all but one of the remaining violations had been cleared by April 2017.

The insurers offered expert testimony from entomologist Herb Field, who opined the units had experienced a "very large" cockroach infestation exceeding 35 days.  He could not say, however, whether the infestation had persisted for "several years," as some of the *Hardison* tenants had claimed.  Field testified Anza's "complaint-driven" approach fell "below the standard of care" and, based on the years of DPH citations, the LLC "should have done something" to change its "failing approach" to fighting the cockroach infestation.  He recognized some of the tenants allowed unsanitary conditions in their units and did not cooperate in making their property accessible, but maintained this should not have prevented the LLC from ridding the infestation.  He also acknowledged Enviroworx had been "trying to get rid of the cockroaches," but determined they "just didn't know how" to eradicate the infestation.

### 7.    *The Statement of Decision*

The trial court issued a written statement of decision, concluding the insurers had failed to establish the LLC either " 'expected' " the conditions of the property to result in the *Hardison* tenants' alleged injuries, or "had the 'subjective' knowledge of or belief that the condition of the property would result in damage."  At worst, the court found the LLC had acted negligently in failing to maintain the Royal Palms in a habitable condition.  It made a series of express factual findings in support of these conclusions, including:

12

- "The County [DPH] found that most of the violations at the property had been 'corrected' or that 'no further action' was necessary."
- "While [the *Hardison*] tenants testified that the cockroach infestation was a problem for many years, entomologist Field testified that from his observations, he could only determine that the cockroach infestation had been present 'for several months.' "
- "It was reasonable for [the LLC] to believe that Envirowor[x], a pest control company, would address any tenant complaints concerning cockroaches or other pests."
- "[PII] and CSE failed to prove that [the LLC] 'expected' the condition of the property to result in damage."
- "[PII] and CSE failed to prove that [the LLC] had subjective knowledge of or belief that the condition of the property would result in damage."

## 8.  *The Judgment and Consolidated Appeals*

The court entered judgment in favor of PII and against the LLC for reimbursement of $304,796.66 for the portion of the *Hardison* settlement PII paid toward the tenants' purported attorney fees, and entered judgment in favor of the LLC and against PII and CSE on all other claims.

PII gave notice of entry of judgment and filed a memorandum of costs.  The LLC filed a motion to tax PII's costs. The trial court denied the LLC's motion, concluding PII was the party with the " 'net monetary recovery' " and thus the prevailing party under governing law.

13

The LLC filed timely notices of appeal from the judgment and the denial of its motion to tax costs. PII and CSE each filed separate timely cross-appeals from the judgment. We consolidated all pending appeals arising out of the coverage action.

## DISCUSSION

1. ***The Evidence Does Not Compel Judgment in Favor of the Insurers for Reimbursement of the Entire Settlement***

We begin with the insurers' cross-appeals. Both PII and CSE contend the undisputed evidence proved the *Hardison* tenants' injuries were "the inevitable consequences of conscious decisions" made by the LLC, and therefore did not arise out of a covered "occurrence" under the relevant insurance policies.[7] The trial court disagreed, finding the insurers "failed to prove" the LLC " 'expected' the condition of the property to result in damage." We conclude this finding is legally sufficient to support the court's judgment, and the insurers have failed to establish reversible error.

The relevant insurance policies include a standard occurrence-based coverage provision. (See *Golden Eagle Ins. Corp. v. Cen-Fed, Ltd.* (2007) 148 Cal.App.4th 976, 986 (*Golden Eagle*).) Under this provision, the insurers are obligated to pay, on behalf of the LLC, "those sums that the [LLC] becomes legally

---

[7] CSE has joined the arguments set forth in PII's opening brief for reimbursement of the entire settlement. (See Cal. Rules of Court, rule 8.200(a)(5).) As we discuss later, CSE also challenges the judgment to the extent it rejected the insurer's claim for reimbursement of the portion of the settlement that CSE attributes to the *Hardison* tenants' attorney fees.

14

obligated to pay as damages because of 'bodily injury' or 'property damage' " that is "caused by an '*occurrence*.' "  (Italics added.) The policies define an "occurrence" as "an *accident*, including continuous or repeated exposure to substantially the same general harmful conditions."  (Italics added.)  Thus, "the question of coverage turns on whether the [alleged] injury to [the *Hardison* tenants] was the result of an 'accident' caused by [the LLC]." (*Liberty Surplus Ins. Corp. v. Ledesma & Meyer Construction Co., Inc.* (2018) 5 Cal.5th 216, 230 (conc. opn. of Liu, J.) (*Ledesma*).)

The insurers contend the trial court misconstrued the meaning of "accident" when it required them to prove the LLC " 'expected' " the condition of the property to cause harm.  They argue an " 'accident' refers to an unexpected or unforeseen *cause*, not to whether the *effect* was intended or expected."  (Italics added.)  And they maintain it is " '*irrelevant*' " whether " 'the insured expected or intended the conduct to cause harm,' " because the determinative question " 'is whether an accident gave rise to [the] claimant's injuries.' "  Because the proper interpretation of policy language is an issue of law, we review the insurer's contentions de novo.  (See *Powerine Oil Co., Inc. v. Superior Court* (2005) 37 Cal.4th 377, 390.)  We conclude the trial court's construction of the term "accident" is consistent with established law.

Although not defined in the policies, "the meaning of the term 'accident' in a liability insurance policy is settled in California."  (*Ledesma, supra,* 5 Cal.5th at p. 221.)  " '[A]n accident is " 'an unexpected, unforeseen, or undesigned happening or consequence from either a known or an unknown cause.' " ' "  (*Ibid.,* quoting *Delgado v. Interinsurance Exchange of Automobile Club of Southern California* (2009) 47 Cal.4th 302,

15

308 (*Delgado*).)  In the coverage clause of a liability policy, the word " ' "[a]ccident" . . . refers to the conduct of the insured for which liability is sought to be imposed.' " (*Ledesma*, at p. 221, quoting *Delgado,* at p. 311, italics omitted.)  " '[T]he term "accident" is more comprehensive than the term "negligence" and thus *includes negligence.*' " (*Ledesma,* at p. 221, italics added, quoting *Safeco Ins. Co. v. Robert S.* (2001) 26 Cal.4th 758, 765.)  "Accordingly, a policy providing a defense and indemnification for bodily injury caused by ' "an accident" ' 'promise[s] coverage for liability resulting from the insured's negligent acts.' " (*Ledesma,* at pp. 221–222, italics omitted.)

　　*Ledesma* is controlling.  There, the insured (L&M) had hired an assistant superintendent (Hecht) to manage a construction project at a middle school.  (*Ledesma, supra,* 5 Cal.5th at p. 220.)  Years later, a student (Doe) sued L&M for negligently hiring, retaining, and supervising Hecht, alleging Hecht sexually abused her.  (*Ibid.*)  The insurer (Liberty) defended L&M under a reservation of rights and simultaneously sought declaratory relief in federal court on the ground that the student's alleged injuries were not " 'caused by an "occurrence" ' "—"defined as 'an accident' " under the policy. (*Ibid.*)  The district court granted summary judgment to Liberty. Our Supreme Court concluded the federal court erred.[8]  (*Id.* at p. 221.)

---

[8]　　The matter came to our high court on the following question of California insurance law posed by the United States Court of Appeals for the Ninth Circuit:  "When a third party sues an employer for the negligent hiring, retention, and supervision of an employee who intentionally injured that third party, does the suit allege an 'occurrence' under the employer's commercial

16

The dispositive issue in *Ledesma* was whether the student's alleged injury could be "considered 'accidental' " under the standard occurrence-based coverage provision in the insurance policy. (*Ledesma, supra,* 5 Cal.5th at p. 220.) The district court reasoned there was no accident, as L&M's " 'intentional acts' " of hiring, supervising, and retaining Hecht did not become accidental " 'simply because [L&M] did not intend for the injury to occur.' " (*Id.* at p. 224.) Our Supreme Court disagreed with this analysis. A " 'deliberate act,' " the *Ledesma* court explained, can constitute an accident if " 'some additional, unexpected, independent, and unforeseen happening occurs that produces the damage.' " (*Id.* at p. 225.) In contrast, when " '[a]ll of the acts, the manner in which they were done, and the *objective accomplished* occurred exactly as [the insured] intended,' " there has been no accident, regardless of whether the insured understood his intended objective would result in harm to the injured party. (*Ibid.*, italics added, quoting *Merced Mutual Ins. Co. v. Mendez* (1989) 213 Cal.App.3d 41, 50 (*Merced*).) Because L&M's objective in hiring Hecht was not that he would commit molestation, the *Ledesma* court concluded the student's injury was caused by "an accident" on L&M's part: "Even though the hiring, retention, and supervision of Hecht may have been 'deliberate act[s]' by L&M, the molestation of Doe could be considered an 'additional, unexpected, independent, and unforeseen happening . . . that produce[d] the damage.' " (*Ledesma,* at p. 226.)

---

general liability policy?" (*Ledesma, supra,* 5 Cal.5th at p. 220, citing *Liberty Surplus Ins. Corp. v. Ledesma & Meyer Construction Co.* (9th Cir. 2016) 834 F.3d 998, 1000.)

17

In concluding coverage was available to L&M notwithstanding its deliberate conduct, our high court drew a crucial distinction between the facts of *Ledesma* and past cases where "the insured's intentional tortious conduct was the *immediate cause* of injury." (*Ledesma, supra,* 5 Cal.5th at p. 225, italics added, citing *Delgado, supra,* 47 Cal.4th 302.) Unlike those cases, "Hecht's molestation was the act directly responsible for the injury, while L&M's negligence in hiring, retaining, and supervising him was an *indirect cause.*" (*Ledesma,* at p. 225, italics added.) This distinction made a difference because, although "a finder of fact could conclude the causal connection between L&M's alleged negligence and the injury inflicted by Hecht was *close enough* to justify the imposition of liability on L&M," "from L&M's point of view," the molestation still "could have been ' "an *unexpected,* unforeseen, or undesigned happening or *consequence*" ' of its hiring, retention, or supervision of Hecht." (*Id.* at pp. 225, 228, italics added.) Framing its analysis in terms of the occurrence-based coverage provision, the *Ledesma* court explained, "As alleged by Doe, the ' "occurrence resulting in injury" ' began with L&M's negligence and ended with Hecht's act of molestation." (*Id.* at p. 225.)

As in *Ledesma,* the LLC's intentional conduct in this case was not the *immediate* cause of the *Hardison* tenants' alleged bodily injuries. On the contrary, the *Hardison* complaint makes clear that the immediate cause of injury was the recurring *insect infestation* that plagued the tenants' units, while the LLC's alleged negligent failure to control and permanently eradicate the infestation was an *indirect* cause of injury. Specifically, the *Hardison* complaint alleged the tenants suffered "serious medical and health problems" caused by "pollution from roach feces

18

floating in the air and being inhaled by [p]laintiffs" and "bites from cockroaches, bedbugs and other insects."[9] There is no dispute that the LLC deliberately implemented its pest control measures, and the *Hardison* plaintiffs plainly sought to hold the LLC liable because these measures failed to stop the infestations. Critically, however, the trial court found the Insurers "failed to prove" the LLC " 'expected' " these measures would not control the infestation, as it was "reasonable for [the LLC] to believe that Envirowor[x], a pest control company, would address any tenant complaints concerning cockroaches or other pests." To paraphrase *Ledesma*, "[e]ven though the hiring, retention, and supervision of [Enviroworx] may have been 'deliberate act[s]' by [the LLC]," the persistence of the insect infestation in the face of this measure "could be considered an 'additional, unexpected, independent, and unforeseen happening . . . that produce[d] the damage.' " (*Ledesma, supra,* 5 Cal.5th at p. 226.)

The indirect causal connection between the LLC's alleged tortious conduct and the *Hardison* tenants' alleged injuries distinguishes this case from those relied upon by the insurers. *Delgado* is instructive. The insured in *Delgado* tendered his defense to his insurer after he was sued for battery.[10] (*Delgado,*

---

[9] Citing these allegations in its trial brief, PII likewise recognized that the relevant "alleged 'bodily injury' and 'property damage' claimed by the [*Hardison* tenants] was caused by a cockroach infestation."

[10] As part of a settlement of the battery action, the insured assigned to the victim his claims against the insurer. (*Delgado, supra,* 47 Cal.4th at p. 306.) The victim then filed the coverage action against the insurer that resulted in the *Delgado* opinion.

*supra,* 47 Cal.4th at p. 306.) In arguing his "mistaken and unreasonable belief in the need for self-defense convert[ed] the assault into an accidental act," the insured insisted "the injured party's provocative acts [were] unforeseen and unexpected," making his "responsive acts unplanned and therefore accidental." (*Id.* at p. 314.) The *Delgado* court rejected the argument, explaining, "an accident exists whenever *any* part of the causal events *leading to* the injury was unintended," and this principle logically does "not [apply] to events *preceding* the acts of the insured." (*Id.* at p. 315, second and third italics added.) The court illustrated the point with the following hypothetical:

> " 'When a driver intentionally speeds and, as a result, negligently hits another car, the speeding would be an intentional act. However, the act directly responsible for the injury—hitting the other car—was not intended by the driver and was fortuitous. Accordingly, the occurrence resulting in injury would be deemed an accident.' " (*Id.* at p. 316.)

Unlike the driver's intentional act of speeding, the *Delgado* court explained the insured's intentional "use of force on" the victim was the act directly responsible for injury, and "taking into consideration acts or events *before* the insured's acts would be illogical and contrary to California case law." (*Id.* at p. 315, italics added.)

Like the speeding driver in the *Delgado* court's hypothetical, the LLC plainly intended to implement its allegedly

---

(*Ibid.*) For simplicity, in discussing the coverage action, we refer to the victim as the insured.

negligent pest control measures. However, also as in the hypothetical, a fact finder could conclude the LLC did not intend or expect the subsequent act that was directly responsible for the tenants' bodily injuries—namely, the persistent insect infestation of the *Hardison* tenants' units. Unlike *Delgado* and the other cases the insurers rely upon, this is not a case where the undisputed evidence proved "the insured intended all of *the acts* that resulted in the victim's injury" but "did not intend to cause injury." (*Merced, supra,* 213 Cal.App.3d at p. 50, italics added.)[11] On the contrary, the insurers' expert entomologist himself acknowledged there had been over 100 applications of pest control treatments at the premises between 2015 and 2017,

_____

[11] See, e.g., *Merced, supra,* 213 Cal.App.3d at pp. 48, 51–52 [where insured conceded he intentionally engaged in sexual conduct, but urged he intended no injury, alleged sexual assault was not "accidental," regardless of insured's mistaken belief that victim consented]; *Quan v. Truck Ins. Exchange* (1998) 67 Cal.App.4th 583, 598–599 [insured's deliberate sexual acts were not an accident, notwithstanding insured's mistaken belief that victim consented]; *Fire Ins. Exchange v. Superior Court* (2010) 181 Cal.App.4th 388, 390 [insureds' deliberate construction of structure that encroached onto another's property was "not an accident," notwithstanding insureds' "good faith but mistaken belief that they were legally entitled to build where they did"]; *Golden Eagle, supra,* 148 Cal.App.4th at p. 989 [on breach of contract claim, insured's deliberate "managerial decisions" that directly resulted in "failure to fulfill its promised maintenance obligations" were not a "fortuitous accident"]; see also *Uhrich v. State Farm Fire & Casualty Co.* (2003) 109 Cal.App.4th 598, 611 [where "extrinsic" evidence proved insured's "conduct was intentional," plaintiff could not "invoke coverage simply by pleading 'negligence' in the complaint"].)

21

and "you could say that at least [the LLC] tried"—i.e., intended—to eradicate the infestation. The trial court did not misconstrue the settled meaning of the term "accident" by requiring the insurers to prove the LLC expected its deliberate pest control measures would result in the recurring insect infestation that directly caused the *Hardison* tenants' alleged injuries.

The insurers do of course challenge the trial court's failure-of-proof finding; however, our prescribed standard of review makes it "almost impossible" for them to prevail in this effort. (*Bookout v. State of California ex rel. Dept. of Transportation* (2010) 186 Cal.App.4th 1478, 1486 (*Bookout*).) As the parties seeking reimbursement of the settlement payments, the insurers had the burden of proving the *Hardison* tenants' alleged injuries did not arise out of a covered "occurrence" under the insurance policies. (See *Buss v. Superior* Court (1997) 16 Cal.4th 35, 53 (*Buss*); *Navigators Specialty Ins. Co. v. Moorefield Construction, Inc.* (2016) 6 Cal.App.5th 1258, 1287 (*Navigators*).) Where, as here, the judgment rests on the fact finder's determination that the appellant failed to satisfy its burden of proof, the question for the reviewing court is *not* "whether there is substantial evidence in the record to support the trial court's conclusion," but rather " 'whether the evidence compels a finding in favor of the appellant as a matter of law.' " (*Valero v. Board of Retirement of Tulare County Employees' Assn.* (2012) 205 Cal.App.4th 960, 965–966 (*Valero*); *Roesch v. De Mota* (1944) 24 Cal.2d 563, 570–571; *Caron v. Andrew* (1955) 133 Cal.App.2d 402, 409.) Specifically, the question is " 'whether the appellant's evidence was (1) "uncontradicted and unimpeached" and (2) "of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding" ' "

in the appellant's favor.  (*Valero,* at p. 966; *Roesch,* at p. 571; *Dreyer's Grand Ice Cream, Inc. v. County of Kern* (2013) 218 Cal.App.4th 828, 838.)

Reviewing courts have consistently recognized "it is almost impossible" for the party who had the burden of proof "to prevail on appeal by arguing the evidence compels a judgment in his favor." (*Bookout, supra,* 186 Cal.App.4th at p. 1486.)  This is because "unless the trial court makes specific findings of fact *in favor of the losing plaintiff,*" a reviewing court must "presume the trial court found the plaintiff's evidence lacks sufficient weight and credibility to carry the burden of proof." (*Ibid.,* italics added, citing *Rodney F. v. Karen M.* (1998) 61 Cal.App.4th 233, 241; see also *Almanor Lakeside Villas Owners Assn. v. Carson* (2016) 246 Cal.App.4th 761, 769, 772.)  As a reviewing court, we have no power to judge the credibility of witnesses or to reweigh the evidence.  (*Bookout*, at p. 1486; see *Oldenburg v. Sears, Roebuck & Co.* (1957) 152 Cal.App.2d 733, 742 [trier of fact is the exclusive judge of credibility and can reject evidence as unworthy of credence]; *Hicks v. Reis* (1943) 21 Cal.2d 654, 659–660 [trier of fact may reject the testimony of a witness entirely, even if that testimony is uncontradicted].)  "[T]he trial court's judgment is presumed to be correct on appeal, and we indulge all intendments and presumptions in favor of its correctness." (*Almanor,* at p. 769.)

The insurers contend the trial court "could not" rationally find it was "reasonable for [the LLC] to believe that making no change [to] its chosen complaint-based pest control program (via vendor Enviroworx) would actually abate" the insect infestation.  They point to what they say was "uncontroverted expert testimony at trial" demonstrating it was "unreasonable

23

for the [LLC] <u>to persist</u> (for *years*) with a complaint-based pest control method, when it had been on notice for many years that [this] system had not abated the infestation." Even if the LLC may have expected "for a period of a few months" that its pest control protocol would be effective, the insurers assert "the documentary evidence, County violations, and tenant testimony was undisputed that this infestation went on for years."[12] In view of that evidence, the insurers insist the LLC must have known, "as a matter of law," that the infestation would persist under the same pest control policy that had reliably failed in the past.

There is a critical flaw in the insurers' argument: While the evidence they advance might support a finding that the LLC (through its officers and agents) *should have known* its existing pest control measures would be ineffective, the evidence does not compel a finding that the LLC in fact *did know* the insect infestation would persist. As our Supreme Court explained in *Ledesma*, evidence that an insured should have known his conduct would result in injury is insufficient to deny coverage under an occurrence-based provision because " 'the term "accident" is more comprehensive than the term "negligence" and thus *includes negligence*.' " (*Ledesma, supra,* 5 Cal.5th at p. 221, italics added.) "Accordingly, a policy providing a defense and indemnification for bodily injury caused by ' "an accident" '

---

[12] Although the insurers do not reference their expert's testimony, the record shows an expert entomologist testified he "couldn't say" the cockroach infestation persisted for "several years," as some of the tenants had claimed. At most, he could confirm it had been there for "several months."

'promise[s] coverage for liability resulting from the insured's negligent acts.' " (*Id.* at pp. 221–222, italics omitted.)

The LLC has thoroughly documented conflicts in the evidentiary record that undermine the insurers' contentions about the character and weight of the evidence. (See *Valero, supra,* 205 Cal.App.4th at p. 966.) We need not recount all those conflicts here. It is enough to recognize—as the trial court did in its statement of decision—that on several DPH follow-up inspections for cockroaches, the inspector determined the violations had been "corrected" and "no further action" was necessary. This evidence alone puts to rest the insurers' contention that the LLC necessarily knew its pest control measures would be ineffective. The evidence did not " 'compel[ ] a finding in favor of the [insurers] as a matter of law.' " (*Ibid.*; *Ledesma, supra,* 5 Cal.5th at pp. 220, 225–226.)

The trial court's failure-of-proof finding distinguishes this case from *Navigators*. In *Navigators*, "the trial court found there was no covered occurrence" for damage to flooring caused by vapor emission. (*Navigators, supra,* 6 Cal.App.5th at p. 1262.) The evidence supported this finding, as it showed the insured had "directed the flooring subcontractor to install the flooring despite [the insured's] knowledge that moisture vapor emission from the concrete slab exceeded specifications." (*Ibid.*) In view of the trial court's factual finding, the *Navigators* court naturally concluded "damage was not produced by an additional, unexpected, independent, and unforeseen happening," notwithstanding the insured's mistaken belief that vapor emission posed " '[l]ow to no risk' " of causing damage. (*Id.* at pp. 1263, 1267.) Unlike the trial court in *Navigators*, the trial court here found the insurers failed to prove the LLC knew the insect infestation

25

would persist, and we are obliged to accept the court's failure-of-proof determination absent uncontradicted evidence compelling a finding in the insurers' favor.  (See *Bookout, supra,* 186 Cal.App.4th at p. 1486; *Valero, supra,* 205 Cal.App.4th at p. 966.)

Because we conclude the trial court correctly determined coverage was available under the occurrence-based provision, we need not address the court's alternative finding regarding "personal and advertising injury" coverage or the "knowing violation" exclusion.

**2.** **Triable Issues Regarding Construction of the** **Hardison** ***Settlement Agreement Preclude Summary Adjudication of PII's Attorney Fee Reimbursement Claims***

We now turn to the LLC's appeal from the order granting PII summary adjudication of its claims for declaratory relief and reimbursement of purported attorney fees paid in the *Hardison* settlement.  We review an order granting summary adjudication de novo.  (*Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 476; *Certain Underwriters at Lloyd's of London v. Superior Court* (2001) 24 Cal.4th 945, 972.)  Summary adjudication is appropriate when the papers submitted show there is no triable issue of material fact and the moving party is entitled to adjudication in its favor as a matter of law.  (Code Civ. Proc., § 437c, subds. (c), (f)(1); *Certain Underwriters,* at p. 972.)  "We independently review the parties' papers supporting and opposing the motion, using the same method of analysis as the trial court."  (*Kline v. Turner* (2001) 87 Cal.App.4th 1369, 1373.)  In doing so, we must liberally construe the opposing party's evidence, strictly construe the moving party's evidence, and resolve all doubts and reasonable inferences in favor of

26

the opposing party. (*Johnson v. American Standard, Inc.* (2008) 43 Cal.4th 56, 64; *McDonald v. Antelope Valley Community College Dist.* (2008) 45 Cal.4th 88, 96–97; *Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 768; *Borman, supra,* 59 Cal.App.5th at p. 1055.)

PII moved for summary adjudication on the ground that the insuring agreements did not cover attorney fees paid in connection with the *Hardison* settlement.[13] In support, the insurer offered a declaration from the *Hardison* tenants' attorney, stating he had received a total of $407,000 in fees from the settlement paid to the tenants. PII's evidence also included a premeditation report by the defense counsel it had retained in the *Hardison* litigation, opining that the tenants' claim under section 1942.4 exposed the LLC to significant liability

---

[13] The parties appear to agree attorney fees do not constitute covered "damages" under the standard form insurance policies at issue here. (See, e.g., *Cutler-Orosi Unified School Dist. v. Tulare County School etc. Authority* (1994) 31 Cal.App.4th 617, 631 ["a supplementary payment provision obligating the insurer to pay all costs taxed against the insured" would be rendered "superfluous" if the court were "to treat attorney fees as damages" under policy]; accord *Insurance Co. of North America v. National American Ins. Co.* (1995) 37 Cal.App.4th 195, 206 (*National American*).) Moreover, although the LLC challenges the trial court's construction of the policies' supplementary payments provision, the company also acknowledges that, even under its preferred construction, the provision "did not apply" to purported attorney fees paid in connection with the *Hardison* settlement. Accordingly, we need not discuss the supplementary payments provision, and will limit our analysis to the LLC's contention that the *Hardison* settlement did not include the payment of "fees not covered by the insuring agreement."

27

for statutory attorney fees.  The trial court granted PII's motion, concluding the *Hardison* settlement resolved the tenants' claim for attorney fees; PII was not obligated to pay attorney fees under the relevant insurance policies; and PII's evidence established a reasonable allocation between potentially covered damages and noncovered attorney fees.

The LLC contends PII's evidence was insufficient to prove the insurer paid any of the *Hardison* tenants' attorney fees in connection with the settlement.  The company argues the trial court misconstrued the terms of the settlement agreement by refusing to give effect to an express provision stipulating that the parties would "bear their own costs and attorney fees incurred in this matter."  The LLC maintains this cost-waiver provision, together with the settling parties' decision not to allocate any part of the settlement to attorney fees (as well as other extrinsic evidence), raised triable issues of fact precluding summary adjudication.  We agree.

"Under statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs interpretation.  [Citation.]  Such intent is to be inferred, if possible, solely from the written provisions of the contract. [Citation.]  The 'clear and explicit' meaning of these provisions, interpreted in their 'ordinary and popular sense,' unless 'used by the parties in a technical sense or a special meaning is given to them by usage' [citation], controls judicial interpretation. [Citation.]  Thus, if the meaning a layperson would ascribe to contract language is not ambiguous, we apply that meaning." (*AIU Ins. Co. v. Superior Court* (1990) 51 Cal.3d 807, 821–822 (*AIU*), citing §§ 1636, 1638, 1639, 1644.)

Notwithstanding the foregoing rules, our Supreme Court has held "rational" contract interpretation nonetheless "requires at least a preliminary consideration of all credible evidence offered to prove the intention of the parties." (*Pacific Gas & Elec. Co. v. G. W. Thomas Drayage & R. Co.* (1968) 69 Cal.2d 33, 39–40 (*Pacific Gas*).) Thus, even when the language of a contract "appears to the court to be unambiguous," parol evidence may be admissible "to prove a meaning to which the language is 'reasonably susceptible.' " (*Winet v. Price* (1992) 4 Cal.App.4th 1159, 1165 (*Winet*); accord *Pacific Gas,* at p. 39 ["The fact that the terms of an instrument appear clear to a judge does not preclude the possibility that the parties chose the language of the instrument to express different terms."].) "Such evidence includes testimony as to the 'circumstances surrounding the making of the agreement . . . including the object, nature and subject matter of the writing . . .' so that the court can 'place itself in the same situation in which the parties found themselves at the time of contracting.' [Citations.] If the court decides, after considering this evidence, that the language of a contract, in the light of all the circumstances, 'is fairly susceptible of either one of the two interpretations contended for . . .' [citations], extrinsic evidence relevant to prove either of such meanings is admissible." (*Pacific Gas*, at p. 40.)

The LLC argues the *Hardison* settlement agreement unambiguously incorporated the American Rule, "which provides that each party to a lawsuit must ordinarily pay his own attorney fees." (*Trope v. Katz* (1995) 11 Cal.4th 274, 278.) The company emphasizes that, consistent with the rule, the agreement made no allocation between damages and attorney fees, but instead required the LLC's insurers to make a lump-sum settlement

29

payment of $925,000 to the *Hardison* tenants, from which the tenants could have paid fees according to their private agreements with their attorneys. More significantly, the LLC maintains the agreement expressly incorporated the American Rule through a cost-waiver provision that stated, "The Parties will bear their own costs and attorney fees incurred in this matter." The company contends the provision's "clear and unambiguous" meaning confirms the LLC was not liable to the tenants for their costs and attorney fees under either the settlement agreement or statutory law mandating an award of costs to the "prevailing party" in litigation. (Cf. *DeSaulles v. Community Hospital of Monterey Peninsula* (2016) 62 Cal.4th 1140, 1156–1157 (*DeSaulles*) ["monetary settlement" in favor of plaintiff constituted a "net monetary recovery" entitling her to a mandatory award of statutory costs as the "prevailing party"].) We agree the cost waiver's plain language is reasonably susceptible of an interpretation that relieves the LLC (and its insurers, including PII) of any obligation to pay the *Hardison* tenants' attorney fees incurred in the settled litigation. (See *AIU, supra*, 51 Cal.3d at pp. 821–822; *Winet, supra,* 4 Cal.App.4th at p. 1165; see, e.g., *Whatley-Miller v. Cooper* (2013) 212 Cal.App.4th 1103, 1111 [offer to compromise stating, " 'Each side [is] to bear its own costs,' " had "clear" meaning—defendant "would not be liable to plaintiffs for their costs"].)

In granting summary adjudication, the trial court disregarded the cost waiver and implied an obligation to pay the *Hardison* tenants' attorney fees, notwithstanding the settlement agreement's specification of a lump-sum payment. The court gave two justifications for its decision. First, relying on *Blue Ridge Ins. Co. v. Jacobsen* (2001) 25 Cal.4th 489 (*Blue*

30

*Ridge*), the court determined it was unnecessary for the LLC to agree "to apportion any of the settlement proceeds as attorney fees," because PII had "an 'implied-in-law right of reimbursement' " once the LLC "refuse[d] to assume its own defense." Second, the court reasoned the settlement agreement "was a full release of all claims, demands, and liabilities in connection with the *Hardison* action" and, therefore, "while the settlement did not expressly allocate settlement funds to attorney fees, the settlement agreement by its terms was a settlement of [the attorney fee] claim." Neither justification supports the court's apparent construction of the settlement agreement as a matter of law.[14]

First, there is a crucial difference between *Blue Ridge* and this case. In *Blue Ridge*, the insurer accepted the defense of its insureds under a reservation of rights to dispute coverage for any settlement contribution made to the injured third party. (*Blue Ridge, supra,* 25 Cal.4th at pp. 492, 494.) However, when a settlement offer within the policy limit was subsequently tendered, "the insureds refused to agree the insurer could settle if the insureds would be liable for reimbursing the insurer for any noncovered claims." (*Id.* at pp. 492–495.) The insureds also refused to "assume their own defense" or to waive a bad faith action against the insurer in the event they suffered a judgment exceeding the policy limits. (*Ibid.*) Over the insureds' objection, the insurer accepted the settlement on the insureds' behalf and

---

[14] As we discuss later, whether there is extrinsic evidence to support the court's construction as a matter of fact is an issue that must be addressed by the trial court on remand. (See *Southern Cal. Edison Co. v. Superior Court* (1995) 37 Cal.App.4th 839, 851–852 (*Southern Cal. Edison*).)

proceeded with a claim for reimbursement of the noncovered settlement payment. (*Id.* at p. 496.) Our Supreme Court held the reimbursement action was proper, "even in the absence of the [insureds'] express agreement" to the settlement. (*Id.* at p. 502.) Having satisfied the prerequisites for seeking reimbursement for noncovered claims—including making "an express offer to the insureds that they may assume their own defense"—the insurer had an "implied-in-law right of reimbursement," notwithstanding the insureds' objections to the proposed settlement.[15] (*Id.* at pp. 502–503.)

Unlike the insurer in *Blue Ridge*, PII did not accept the *Hardison* settlement agreement "over the objection of its insureds." (*Blue Ridge, supra,* 25 Cal.4th at p. 493.) On the contrary, *the LLC* accepted the *Hardison* settlement agreement, presumably because the agreement included the exact provisions that the LLC demanded—it did not allocate any portion of the settlement payment to attorney fees and it expressly provided that the parties would "bear their own costs and attorney fees incurred in this matter." Unlike in *Blue Ridge*, the LLC did not "disagree" with PII about "whether to accept the proposed settlement," and the LLC therefore had no reason to "assume [its] own defense." (*Id.* at p. 502.) Under these circumstances,

---

[15] The "prerequisites for seeking reimbursement for noncovered claims included in a reasonable settlement payment" are: "(1) a timely and express reservation of rights; (2) an express notification to the insureds of the insurer's intent to accept a proposed settlement offer; and (3) an express offer to the insureds that they may assume their own defense when the insurer and insureds disagree whether to accept the proposed settlement." (*Blue Ridge, supra,* 25 Cal.4th at p. 502.)

the fact that the LLC declined to defend itself plainly was not a valid reason for the trial court to disregard terms that the *Hardison* tenants and the LLC (and its insurers) voluntarily agreed to include in the settlement agreement.

As for the trial court's secondary rationale, the fact that the settlement constituted a full release of all claims, demands, and liabilities in connection with the *Hardison* action is not incompatible with the parties' explicit agreement to "bear their own costs and attorney fees," nor does it justify the court's decision to disregard this express provision while implying an unexpressed obligation to pay the *Hardison* tenants' attorney fees. Another provision of the agreement underscores the point. In addressing the released claims, the agreement states that it shall be "conclusively deemed to constitute full and final settlement of the Litigation and all Released Matters, inclusive of all insurance, *legal*, medical, or other liens and/or encumbrances, all of which *remain Plaintiffs' sole legal and financial responsibility*." (Italics added.) Contrary to the trial court's construction, this release provision is consistent with the *Hardison* tenants' agreement to bear their own costs and attorney fees incurred in this matter. (See *Lippman v. Sears Roebuck & Co.* (1955) 44 Cal.2d 136, 142 [Judicial authority to insert implied covenants is subject to many strict rules of construction, including that " 'there can be no implied covenant where the subject is completely covered by the contract.' "].)

For its part, PII's position is not that the cost-waiver provision should be disregarded. Instead, the insurer argues the literal construction advanced by the LLC is not what the provision actually means under settled law. PII relies on *Navigators*. In that case, the appellate court held the insurer

33

was obligated under a supplementary payments provision to cover costs of suit, including attorney fees, paid in connection with a settlement between the insured and an injured third party. (*Navigators, supra,* 6 Cal.App.5th at p. 1286.) Like the *Hardison* settlement agreement, the settlement agreement in *Navigators* included a provision stipulating that the parties would " 'bear their own respective costs and attorneys' fees incurred as a result [of] the claims, the action, the [insurance] coverage action and in preparing and executing this agreement.' " (*Id.* at p. 1289.) The insurer argued this cost-waiver provision "conclusively establishe[d] that the entire amount paid in settlement was for damages, for which [the insurer] had a right to be reimbursed." (*Id.* at pp. 1289–1290.) The insured disputed this construction, asserting "such attorney fee and cost waivers are included in settlement agreements to prevent a party from seeking prevailing party attorney fees from the court." (*Id.* at p. 1290.) The *Navigators* court agreed with the insured's proffered interpretation; however, it did so based largely on "*undisputed evidence . . .* that at least some part of the settlement was for attorney fees." (*Ibid.*, italics added.)

As we have explained, even when the language of a contract "appears to the court to be unambiguous," parol evidence may nevertheless be admissible "to prove a meaning to which the language is 'reasonably susceptible.' " (*Winet, supra,* 4 Cal.App.4th at p. 1165; accord *Pacific Gas, supra,* 69 Cal.2d at pp. 39–40.) *Navigators* illustrates this rule in operation. The *Navigators* court first recognized that, notwithstanding its seemingly unambiguous language, the cost-waiver provision was reasonably susceptible of the interpretation urged by the insured, because, "without such waiver, the plaintiff obtaining a monetary

34

recovery in a settlement agreement would be the prevailing party under Code of Civil Procedure section 1032, subdivision (a)(4) and therefore, under section 1032, subdivision (b), would be able to recover costs, which might include attorney fees under Code of Civil Procedure section 1033.5, subdivision (a)(10)." (*Navigators, supra,* 6 Cal.App.5th at p. 1290, citing *DeSaulles, supra,* 62 Cal.4th at p. 1144.) The reviewing court then examined the extrinsic evidence to aid it in determining which of the proffered interpretations corresponded with the parties' apparent intentions at the time of contracting. In resolving that issue, the court observed the "interpretation urged by [the insurer] [was] contrary to the undisputed evidence that the cost of repair damages was $377,404," while the insurer had paid "$1 million" toward the settlement. (*Navigators,* at pp. 1289–1290.) This undisputed evidence necessarily proved that "at least some part of the settlement was for attorney fees." (*Ibid.*) Because the "extrinsic evidence [was] not in conflict," the *Navigators* court independently construed the agreement and reversed the trial court's judgment awarding the insurer reimbursement of the full $1 million payment. (*Id.* at pp. 1286, 1290–1291.)

Here, unlike in *Navigators,* there was conflicting extrinsic evidence about the parties' intended purpose for including the cost-waiver provision in the *Hardison* settlement agreement. Perhaps most notable, the summary adjudication evidence showed that, during the settlement documentation process, after the parties had agreed to the mediator's proposal of a lump-sum settlement payment with each party to pay its own fees and costs, PII's coverage counsel proposed to remove the cost-waiver provision from the draft settlement agreement and to insert a new provision allocating the settlement payment between

35

damages and attorney fees.  The LLC objected to these changes, and they were not included in the final settlement agreement. Nevertheless, if the intended purpose of the cost-waiver provision was, as PII now asserts, to protect the LLC from double liability for the tenants' attorney fees, it is curious that PII's counsel would seek to remove the provision from the draft agreement.[16] On the other hand, PII's proposal and the LLC's objection are more explicable if the parties understood the provision would affect coverage issues—as the LLC maintains—given that PII had made clear throughout the settlement process that it intended to be reimbursed for any attorney fees paid to the *Hardison* tenants.

In any event, our role here is not to resolve these evidentiary conflicts.  Where "a conflict in the [extrinsic] evidence exists, it must be resolved in the trial court, as with any question of fact, before the court can declare the meaning of the contract as a matter of law." (*Southern Cal. Edison, supra,* 37 Cal.App.4th at pp. 851–852.)  Because the cost-waiver provision is susceptible of more than one reasonable interpretation—including one that establishes no attorney fees were paid to the *Hardison* tenants under the settlement agreement—the trial court must receive and consider extrinsic evidence regarding the parties' understanding of the provision at the time of contracting.  (See *Pacific Gas, supra,* 69 Cal.2d at pp. 39–40.)  Triable issues preclude summary adjudication of PII's claims for declaratory relief and reimbursement of alleged

---

[16]    Notably, in advancing its proffered construction of the cost-waiver provision, PII acknowledges in its respondent's brief that it "was not in the interest of [the LLC] nor the carriers to allow the tenants to be paid for the fee claim twice."

36

attorney fees paid in the *Hardison* settlement.[17]  (See *Walter E. Heller Western, Inc. v. Tecrim Corp.* (1987) 196 Cal.App.3d 149, 158 ["When two equally plausible interpretations of the language of a contract may be made . . . parol evidence is admissible to aid in interpreting the agreement, thereby presenting a question of fact which precludes summary judgment if the evidence is contradictory."]; *Wolf v. Superior Court* (2004) 114 Cal.App.4th 1343, 1359–1360 [issuing writ reversing summary adjudication where "reasonableness of [parties'] competing interpretations" remained to be tested in light of extrinsic evidence].)

Our reversal of the summary adjudication order renders moot the LLC's challenge to the reimbursement amount, as well as its appeal from the denial of its motion to tax costs.  On remand, if the trial court determines the settling parties intended to allocate part of the settlement payment to attorney fees that might have been taxed against the LLC under section 1942.4, PII will have the burden of proving by a preponderance of the evidence what amount of the settlement payments was allocable to those fees.  (*Navigators, supra,* 6 Cal.App.5th at p. 1287; see also *Buss, supra,* 16 Cal.4th at p. 53 ["In a 'mixed' action," the insurer is entitled to reimbursement for "[d]efense costs that can be allocated solely to the claims that are not even potentially

_____

[17]   We note PII's declaratory relief claim sought not only a judicial declaration of its rights and obligations under the relevant insurance policies, but also sought a declaration that the *Hardison* settlement "included payment" for the tenants' attorney fees.  Accordingly, the trial court could not completely dispose of the claim without considering extrinsic evidence relevant to the construction of the *Hardison* settlement agreement.

covered."].) The trial court must decide in the first instance what evidence is admissible and what weight to give to the evidence in making this determination, if necessary.

**3.** ***The Trial Court Properly Denied CSE's Attorney Fee Reimbursement Claim***

CSE separately appeals the portion of the judgment denying its claim for reimbursement of attorney fees purportedly paid in the *Hardison* settlement. Although we have determined triable issues exist as to whether attorney fees were paid under the settlement agreement, CSE's cross-appeal is not moot, as the challenged ruling could preclude CSE from pursuing reimbursement on remand in the event the trial court determines attorney fees were in fact part of the settlement payment. With that said, we conclude CSE has failed to demonstrate the *Hardison* tenants' section 1942.4 claim was not potentially covered. The insurer, therefore, has no right to reimbursement of attorney fees that might have been taxed against the LLC.

Section 1942.4 prohibits a landlord from demanding or collecting rent if "all of the following conditions exist" before the landlord's demand: (1) the subject dwelling fails to meet habitability standards set forth in the Health and Safety Code; (2) a public officer "has notified the landlord or the landlord's agent in writing" of the landlord's obligation to abate the substandard conditions; (3) the "conditions have existed and have not been abated 35 days beyond the date of service of the notice" and "the delay is without good cause"; and (4) the conditions were not caused by the tenant. (§ 1942.4, subd. (a).) A landlord who violates section 1942.4 is liable to the tenant for "actual damages," and the "prevailing party" in litigation "shall be entitled to recovery of reasonable attorney's fees and

costs of the suit in an amount fixed by the court." (§ 1942.4, subd. (b).)

CSE agreed to defend the LLC against the *Hardison* tenants' section 1942.4 claim subject to a reservation of rights. Specifically, CSE advised that it would provide a defense under the policy's " 'personal and advertising injury' " coverage provision for " 'wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord o[r] lessor.' " However, the insurer reserved its right to deny coverage under the policy's exclusion for a "Knowing Violation," defined as " '[p]ersonal and advertising injury' . . . [c]aused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict 'personal and advertising injury.' "

CSE acknowledged the policy's supplementary payments provision required it to "pay costs taxed against any insured," including "statutory attorneys' fees." However, it advised that the coverage extended only to "those attorneys' fees awarded for covered claims." It also reiterated its position that "much of the claimed damages for 'personal injury' may not be covered by the Policy" and "expressly reserve[d]" its right to deny indemnity coverage for attorney fees incurred outside the two-year period that CSE's policy was in effect.

Notwithstanding its agreement to defend the action, CSE contends there was no potential for coverage of the *Hardison* tenants' section 1942.4 claim. Because the statute requires proof that the landlord made a prohibited demand for rent after receiving written *notice* of habitability violations, CSE argues the claim necessarily falls under the policy's Knowing Violation

39

exclusion. The insurer maintains the statutory language and the policy exclusion together eliminate its obligation to cover attorney fees that may have been taxed against the LLC in connection with the section 1942.4 claim. The trial court rejected this argument, reasoning a landlord's negligent conduct was sufficient to violate the statute. We review questions of statutory and contract interpretation de novo. (*Davenport v. Blue Cross of California* (1997) 52 Cal.App.4th 435, 445.) We conclude the court correctly construed the statute and policy language to find a potential for coverage based on the LLC's alleged negligent conduct.

CSE's policy has a standard supplementary payments provision stating that, "with respect to any claim we investigate or settle, or any 'suit' against an insured we defend," CSE will pay "[a]ll costs taxed against the insured in the 'suit'." Our courts have recognized the phrase "costs of suit," as used in the provision, includes "attorney fees when they are, or would be, taxable as costs of suit." (*Navigators, supra,* 6 Cal.App.5th at p. 1279, citing *Employers Mutual Casualty Co. v. Philadelphia Indemnity Ins. Co.* (2008) 169 Cal.App.4th 340, 349; *National American, supra*, 37 Cal.App.4th at pp. 206–207.) The phrase " ' "any 'suit' against an insured we defend" ' " means the insurer must pay costs, including attorney fees, arising out of any claim that the insurer has a "duty to defend." (*Navigators,* at p. 1283, citing *Golden Eagle, supra,* 148 Cal.App.4th at p. 996.)

Critically, the "duty to defend is broader than the duty to indemnify." (*Navigators, supra,* 6 Cal.App.5th at p. 1283, citing *Horace Mann Ins. Co. v. Barbara B.* (1993) 4 Cal.4th 1076, 1081.) " 'It is by now a familiar principle that a liability insurer owes a *broad* duty to defend its insured against claims that

40

create a *potential for indemnity*. [Citation.]' [Citation.] '[T]he test is whether the underlying action for which defense and indemnity is sought *potentially* seeks relief within the coverage of the policy.' [Citation.] 'In other words, the insured need only show that the underlying claim may fall within policy coverage; *the insurer must prove it cannot.*' " (*Navigators,* at p. 1283, italics added, italics omitted, citing *La Jolla Beach & Tennis Club, Inc. v. Industrial Indemnity Co.* (1994) 9 Cal.4th 27, 44; *Montrose Chemical Corp. v. Superior Court* (1993) 6 Cal.4th 287, 300.) "Any doubt as to whether the facts give rise to a duty to defend is resolved in the insured's favor." (*Horace Mann,* at p. 1081.)

CSE argues a section 1942.4 claim cannot fall within policy coverage because the requirement that a public officer "has notified the landlord or the landlord's agent in writing" of the obligation to abate substandard conditions (§ 1942.4, subd. (a)(2)) necessarily brings the claim within the Knowing Violation exclusion. We disagree. By its terms, the Knowing Violation exclusion applies only when the insured engages in deliberate conduct "with the knowledge that the act would violate the rights of another and would inflict 'personal and advertising injury.' " Under section 1942.4, a landlord need not have *actual knowledge* that its conduct will violate a tenants' right of private occupancy to be found liable for a statutory violation. On the contrary, a landlord may be held liable under the statute if, despite receiving notice of its duty to abate substandard conditions, the conditions "have not been abated 35 days beyond the date of service of the notice" and "the delay is *without good cause.*" (*Id*., subd. (a)(3), italics added.)

Our Supreme Court has articulated the following general principles about good cause requirements: "The concept of good

41

cause . . . calls for a factual exposition of a *reasonable ground* for the [relief] sought. . . . [G]ood cause may be equated to a *good reason* for a party's failure to perform that specific requirement from which he seeks to be excused." (*Waters v. Superior Court of Los Angeles County* (1962) 58 Cal.2d 885, 893, italics added (*Waters*).) Our state appellate courts have similarly recognized that, while " 'good cause' " can be "difficult to define with precision," its "essential ingredients [are] reasonable grounds and good faith." (*R. J. Cardinal Co. v. Ritchie* (1963) 218 Cal.App.2d 124, 145; accord *Kowal v. Day* (1971) 20 Cal.App.3d 720, 724; *In re Marriage of Leonard* (2004) 119 Cal.App.4th 546, 558; *People v. Accredited Surety Casualty Co.* (2014) 230 Cal.App.4th 548, 560.) Because reasonableness is a fundamental component of good cause, negligence is, by definition, incompatible with the concept. (See, e.g., *Mendoza v. City of Los Angeles* (1998) 66 Cal.App.4th 1333, 1339 [an essential element of negligence is the defendant's breach of the duty to use "reasonable care" resulting in injury to another].)

Applying these principles to section 1942.4, we construe the statute to permit a landlord to demand rent, even while substandard habitability conditions persist, so long as the landlord has a "good reason" or "reasonable ground[s]" for a delay in abating the conditions. (*Waters, supra,* 58 Cal.2d at p. 893.) However, a tenant can defeat this safe harbor and establish a statutory violation by proving the landlord did not act with good cause and instead was *negligent* in failing to abate the conditions within the time prescribed under the statute. (See, e.g., *Sykes v. Superior Court of Orange County* (1973) 9 Cal.3d 83, 94 [where "failure to take timely action" could be attributed to only "carelessness or negligence," good cause for delay was not

42

established].)  In view of the statute's remedial purpose, it is no surprise the Legislature crafted a standard that imposes *broader liability* on an offending landlord than the actual knowledge standard that CSE's argument assumes.  (See, e.g., *Barela v. Superior Court of Orange County* (1981) 30 Cal.3d 244, 251 ["remedial statute aimed at protecting tenants from certain types of abuses . . . is to be 'liberally construed to effect its objectives and to suppress, not encourage, the mischief at which it was directed' "].)  Because proof of negligence is sufficient to establish a statutory violation, the trial court did not err in concluding the Knowing Violation exclusion did not apply to the *Hardison* tenants' section 1942.4 claim.  (Cf. *Big 5 Sporting Goods Corp. v. Zurich American Ins.* (C.D.Cal. 2013) 957 F.Supp.2d 1135, 1156 [statute requiring "intentional conduct" to obtain relief was excluded from coverage under " 'implied exclusionary clause' " for "loss due to 'willful acts' by the insured"].)

Alternatively, CSE argues there was no potential for coverage of the section 1942.4 claim because there was no evidence admitted at trial to prove the LLC received a notice of violation during the two-year period when the insurer's policy was in effect.  (See § 1942.4, subd. (a)(2).)  There are at least two related problems with this contention.  First—as the LLC demonstrates and CSE fails to refute—the insurer did not contend in the underlying trial that it was entitled to reimbursement of purported attorney fees paid in the *Hardison* settlement because a notice of violation had not been issued during the policy period.  Because this new contention raises a potentially disputed factual issue, we are compelled to deem it forfeited as a basis for reversal of the judgment.  (See, e.g.,

43

*14859 Moorpark Homeowner's Assn. v. VRT Corp.* (1998) 63 Cal.App.4th 1396, 1403, fn. 1 [declining to consider new argument raised for "the first time on appeal" implicating "factual questions" that should have been determined in the trial court].)

The second problem relates to the first. As we have discussed, when an insurer like CSE brings an action for reimbursement under a reservation of rights, the "insurer, not the insured, has the burden of proving by a preponderance of the evidence that 'the settlement payments were allocable to claims not actually covered, and the defense costs were allocable to claims not even potentially covered.' " (*Navigators, supra,* 6 Cal.App.5th at p. 1287; accord *Buss, supra,* 16 Cal.4th at p. 53 ["It is the insurer that must carry the burden of proof" when it "seeks reimbursement for defense costs from the insured."].) Because CSE did not raise the issue before the trial court, it failed to introduce evidence to prove the LLC did not receive a notice of violation during the policy period, and the trial court naturally made no finding to support the contention CSE now makes on appeal. CSE has failed to satisfy its appellate burden. (See *Bookout, supra,* 186 Cal.App.4th at p. 1486 ["unless the trial court makes specific findings of fact in favor of the losing plaintiff," a reviewing court must "presume the trial court found the plaintiff's evidence lacks sufficient weight and credibility to carry the burden of proof"].)

Because the section 1942.4 claim raised a potential for coverage, CSE is not entitled to reimbursement of attorney fees taxed against the LLC in the *Hardison* settlement, if any.[18]

---

[18] In its opening brief, CSE argued a "time-on-the-risk" agreement made between the various insurers established

# DISPOSITION

The judgment is reversed with respect to the summary adjudication of Philadelphia Indemnity Insurance Company's claims for declaratory relief and reimbursement of purported attorney fees paid in the *Hardison* settlement, and the costs award is vacated. In all other respects the judgment is affirmed.

---

a reasonable allocation of the *Hardison* settlement payment and afforded CSE a right to reimbursement for the liability periods its policy was not in effect. In its reply brief, CSE appears to abandon the argument, clarifying that it seeks reimbursement only on the ground that "there is no potential for coverage under section 1942.4" and that it does "not [seek] reimbursement of improperly allocated covered claims among insurers." In any event, to the extent CSE relies upon the insurers' time-on-the-risk agreement as a basis for reimbursement, we reject the argument. (See *Aerojet-General Corp. v. Transport Indem.* (1997) 17 Cal.4th 38, 72 ["Equitable contribution applies *only* between insurers" and it "therefore has no place between insurer and insured, which have contracted the one with the other."]; *State of California v. Pacific Indemnity Co.* (1998) 63 Cal.App.4th 1535, 1548 [the "argument that [the insurer's] duty to defend should be apportioned with its insured based on the one year of its coverage is contrary to California law"].)

The matter is remanded to the trial court for further proceedings consistent with this opinion. Defendant 38700 10th Street East, LLC is entitled to costs.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EGERTON, J.

We concur:

EDMON, P. J.

BERSHON, J.*

---